## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MARTHA S. DICKEY WILLIAMS,

     *Plaintiff*,

*v.*                              CASE NO. 12-CV-12220

COMMISSIONER OF            DISTRICT JUDGE STEPHEN J. MURPHY, III
SOCIAL SECURITY,         MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I. RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.


## II. REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability, Disability Insurance

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Benefits ("DIB") and Supplemental Security Income Benefits ("SSI"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 12.)

Plaintiff Martha S. Dickey Williams was 50 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 33, 113, 116.) Plaintiff's employment history includes work as an assembler for an auto manufacturer for 20 years. (Tr. at 180.) Plaintiff filed the instant claims on July 31, 2008, alleging that she became unable to work on November 18, 2005. (Tr. at 113, 116.) The claims were denied at the initial administrative stages. (Tr. at 68.) In denying Plaintiff's claims, the Commissioner considered tendonitis and depressive disorder as possible bases for disability. (*Id.*) On September 2, 1010, Plaintiff appeared before Administrative Law Judge ("ALJ") Deborah L. Rose, who considered the application for benefits *de novo*. (Tr. at 9-29, 33-67.) In a decision dated October 26, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 24.) Plaintiff requested a review of this decision on November 1, 2010. (Tr. at 8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on March 19, 2012, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-5.) On May 21, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

## B.      Standard of Review

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137,

142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations

based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

4

without directly addressing in his written decision every piece of evidence submitted by a party");

*Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

Judicial review of the ALJ's decision is direct, "but we play an 'extremely limited' role." *Simila v. Astrue,* 573 F.3d 503, 513-14 (7th Cir. 2009). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). Just as "'[n]o trial is perfect,' . . . no administrative hearing or opinion is either[;] thus, in analyzing an ALJ's decision, a reviewing court is to look for 'fatal gaps or contradictions' and not 'nitpick' in search of essentially meaningless missteps." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1965 (N.D. Ill. 2011).

## C.     Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and

considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2011, and that Plaintiff had not engaged in substantial gainful activity since November 18, 2005, the alleged onset date. (Tr. at 14.) At step two, the ALJ found that Plaintiff's tendonitis (overuse syndrome of upper extremities), status post carpal tunnel release of thumb, and depression were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 14-17.) At step four, the ALJ found that Plaintiff could not perform her past relevant work. (Tr. at 23.) At step five, the ALJ found that Plaintiff could perform a limited range of light and sedentary work. (Tr. at 18-22.) The ALJ also found that Plaintiff was a younger individual (i.e., between the ages of 18 and 49) on the alleged disability onset date. (Tr. at 23.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 24.)

### E.   Administrative Record

### 1.   Physical Impairments

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was treated by John M. Markley, Jr., M.D., from 1991 through 2005 for carpal tunnel syndrome. (Tr. at 231-331.) Dr. Markley performed carpal tunnel release and deQuervain's release on Plaintiff in April of 1991 and 2001. (Tr. 237, 295, 335.) As of 2002, Dr. Markley stated that Plaintiff could "continue with the current sedentary level light use job with the same ongoing restrictions." (Tr. at 256.) In November 2005, Dr. Markley noted that Plaintiff's "level of work

restrictions have not changed and, in my estimation are permanent. She should be limited to sedentary light level use job restrictions." (Tr. at 261.) In November 2006, it was noted that Plaintiff had "been laid off for a year." (Tr. at 262.)

Dr. Hing noted that he "referred her to Dr. Chodoroff [but that] [h]is study of 11/30/06 did not show any objective evidence for compression in . . . the bilateral median nerve at the wrist and the cubital tunnel at the wrist and elbow areas." (Tr. at 293.) Brian Chodoroff, M.D., confirmed that he "saw [Plaintiff] back in November of 2006 for an electrodiagnostic study, at which time the findings were normal." (Tr. at 300.) Dr. Chodoroff concluded that "[a]lthough she indicates excellent improvement following previously performed median nerve release surgery, I do not believe that a surgical procedure of that sort should be pursued at this time." (Tr. at 301.)

On December 7, 2006, an upper gastrointestinal exam showed "no hiatal hernia or gastroesophageal reflux" and "compromise in the propulsion of barium through the esophagus, [but] otherwise no intrinsic or extrinsic abnormalities." (Tr. at 671.)

An MRI of the cervical spine taken on March 7, 2007, was "[n]ormal." (Tr. at 396, 668.)

Plaintiff was also treated by Wayne Smith, M.D., from 2006 through 2010 for her diabetes and hypertension. (Tr. at 363-401, 482, 605-74.)

In November 2007, David M. Hing, M.D., noted that Plaintiff had "not had any work since I saw her in December 2006," and that she "has been on restrictions to both hands to avoid high-torque vibratory air electric power tools, avoid repetitive power grasping and power pinch, and no lifting of more than two pounds." (Tr. at 264.) In June 2008, Dr. Hing indicated that although Plaintiff "is currently on restrictions of no lifting more than two pounds, I think that she could lift ten pounds on an occasional basis every fifteen minutes." (Tr. at 265, 297.)

Plaintiff was also treated by Allan Clague, M.D., in May and June of 2008. (Tr. at 332-40.) On June 4, 2008, Plaintiff was examined by Dr. Clague who diagnosed overuse syndrome, "recommended that she apply for Social Security Disability Benefits," and stated, "I never foresee her being able to return to any form of gainful productive employment throughout the remainder of her lifetime." (Tr. at 335.)

On June 18, 2008, Plaintiff was examined and evaluated by Justin Riutta, M.D., who stated that Plaintiff's "clinical examination reveals no clear evidence of any findings that would be consistent with these diagnoses. She shows no significant amplification features, sensitivity throughout the upper extremities, sensory loss from the finger tips all the way to the elbow area, and diffuse sensory loss does not conform to just the median nerve distribution." (Tr. at 330.) Therefore, Dr. Riutta recommended "that she return to work with her prior restrictions of no lifting greater than two pounds" and "[n]o assembly and no repetitive activities in the arm." (Tr. at 330.)

A Physical RFC Assessment completed by Saadat Abbasi, M.D., on September 23, 2009, concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was unlimited in her ability to push or pull. (Tr. at 441.) There were no postural, manipulative, visual, communicative, or environmental limitations established except that handling should be limited and that she should avoid concentrated exposure to vibration. (Tr. at 442-44.) The assessment noted that there was a medical source statement on file that conflicted with the assessment findings in that Dr. Hing stated Plaintiff could lift 10 pounds on an occasional basis every 15 minutes. (Tr. at 446.)

On December 9, 2008, Dr. Clague examined Plaintiff and found that her "gait was normal," "[t]andem walking was good and her balance was good[,]" her lumbosacral spine was normal,

there was some "limitation of motion" in the cervical spine, and an inspection of her "hands revealed hyperextension of the distal phalanx of the fingers"; Dr. Clague stated that these "findings suggest an anterior interosseous nerve syndrome." (Tr. at 468.) Dr. Clague noted that Plaintiff had applied for social security disability benefits and concluded by stating, "I never foresee her being able to return to any form of gainful productive employment throughout the remainder of her lifetime." (Tr. at 469.) On June 18, 2009, March 16, 2010, and July 30, 2010, the findings were essentially the same. (Tr. at 480-81, 536-37, 541-42.)

On August 13, 2009, another Physical RFC Assessment was completed by Neal E. Bente, M.D. (Tr. at 527-32.) The assessment concluded that Plaintiff could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand or walk about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was unlimited in her ability to push or pull. (Tr. at 528.) The assessment also found that Plaintiff should never climb ladders, ropes or scaffolds, should only frequently climb ramps or stairs, balance, stoop, kneel, or crouch, and should only occasionally be required to crawl. (Tr. at 529.) Plaintiff was found to be limited as to manipulation, but was unlimited in the visual, communicative and environmental areas. (Tr. at 529-30.) It was noted that there was a medical source statement that conflicted with the treating neurologist who "limited sitting to less than an hour" because Plaintiff "said she could sit unlimited as long as she did not have to use the UE's.[2] The claimant's statement is given weight." (Tr. at 531 (footnote added).)

On May 12, 2010, Dr. Smith advised Plaintiff "to stop smoking" and when discussing ways to "keep her hands busy[,]" Plaintiff told Dr. Smith that "[s]he likes to do crossword puzzles." (Tr. at 609.)

---

[2]UE stands for upper extremities.

On August 12, 2010, Dr. Clague completed a Physical Medical Source Statement wherein he concluded that Plaintiff was able to sit for 15 minutes at a time, stand for 30 minutes at a time, stand or walk for about 2 hours in an 8-hour workday, and sit for about 4 hours in an 8-hour workday, would need to take unscheduled breaks "at least 20x/day," could only rarely lift less than 10 pounds or perform any twisting, stooping, etc., and could only use her hands, fingers, or arms "1% or less" of the 8-hour workday. (Tr. at 552-53.) Dr. Clague stated that Plaintiff would be "off-task" 100% of the time, that she was incapable of even low-stress work, and that her impairments were likely to produce only bad days. (Tr. at 554.)

### 2. Mental Impairments

Plaintiff also sought treatment with Sharon K. Allen, M.S.W., C.S.W., in July 2008. (Tr. at 341.) On July 7, 2008, Allen diagnosed Plaintiff with "Major Depressive Disorder, 296.3x." (*Id.*) Allen noted that Plaintiff had been prescribed antidepressant medication by her primary care physician and that her depression seemed related to the "inability to perform her job as a line production worker for Ford." (*Id.*) Allen recommended that Plaintiff "be evaluated by a Psychiatrist for medication management." (*Id.*)

Plaintiff was also treated at the Herrick Outpatient Mental Health Center from 2008 through 2010. (Tr. at 343-45, 448-62, 564-604.) Plaintiff participated in therapy at the Herrick Outpatient Behavioral Health Center for several months in 2008. (Tr. at 449-62.) Improvements in symptom control, insight into problems, and coping skills were consistently noted.

On September 9, 2008, Plaintiff was examined, at the request of Disability Determination Services ("DDS"), by Harold Bilotta, Jr., M.S., with the approval of James P. Stewart, Ph.D. (Tr. at 416-22.) Bilotta noted that Plaintiff had "good sense of humor," "demonstrated adequate contact with reality," and was "extremely focused on herself and her symptoms." (Tr. at 419.) Bilotta

diagnosed Depressive Disorder NOA, assessed a GAF score of 53, and gave a "[g]uarded" prognosis. (Tr. at 421.)

A Psychiatric Review Technique completed by John Gallagher, Ed.D., limited license psychologist, on September 24, 2008, diagnosed affective disorders, i.e. depressive disorder, NOS. (Tr. at 423, 426.) Plaintiff was found to have moderate limitations as to activities of daily living and in maintaining concentration, persistence or pace, and only mild limitations in maintaining social functioning. (Tr. at 433.) A Mental Residual Functional Capacity ("RFC") Assessment completed by Gallagher on September 24, 2008, concluded that there was no evidence that Plaintiff was limited at all as to her ability to remember locations and work-like procedures, the ability to understand and remember very short and simple instructions, the ability to carry out very short and simple instructions, and the ability to sustain an ordinary routine without special supervision. (Tr. at 437.) In addition, the assessment found that Plaintiff was not significantly limited in the ability to understand and remember detailed instructions, to carry out detailed instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, and to make simple work-related decisions. (*Id.*) Plaintiff was found to be moderately limited in the ability to maintain concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 437-38.) Plaintiff was found to not be significantly limited in any areas of social interaction or adaptation. (Tr. at 438.) The assessment noted:

> Records show that the claimant was on Zoloft from at least 9/05 by Dr. Smith but Dr. S does not give any dx[3] except to say that she is stressed. There is no other

---

[3]"Dx" stands for diagnosis.

mention of psych concerns in his records from AOD to present. The MSW[4] puts the depression as occurring during the past year. There is no evidence that the depression was any worse prior to CE and eval by Herrick. It is only considered severe here as the combination of depression and pain appears to affect her concentration and daily functioning to some extent. She is still able to sustain simple routine tasks.

(Tr. at 439 (footnotes added).)

On August 13, 2010, Ross L. Thayer, M.S., L.L.P., limited license psychologist, completed a Mental Impairment Questionnaire. (Tr. at 543-48.) Thayer diagnosed anxiety disorder, NOS, and major depressive disorder, and assessed a GAF score of 55. (Tr. at 543.) After listing Plaintiff's symptoms, Thayer concluded that Plaintiff's mental abilities and aptitudes needed to do unskilled work were all "limited but satisfactory" or "seriously limited, but not precluded," except that Plaintiff was unable to meet competitive standards as to working in coordination or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, responding appropriately to changes in a routine work setting, dealing with normal work stress, and being aware of normal hazards and taking appropriate precautions. (Tr. at 544-45.)

With regard to Plaintiff's ability to perform at a consistent pace without an unreasonable number and length of rest periods, Thayer found that Plaintiff's limitations fell in between the "seriously limited, but not precluded" and "unable to meet competitive standards" categories. (Tr. at 545.) Thayer found that Plaintiff was "limited but satisfactory" in her ability to understand and remember detailed instructions and her ability to maintain socially appropriate behavior, and was "unlimited or very good" in her ability to adhere to basic standards of neatness and cleanliness. (Tr. at 546.) Thayer also found that Plaintiff was "seriously limited, but not precluded" from carrying out detailed instructions, dealing with stress of semiskilled and skilled work, and

---

[4]This is a reference to Sharon Allen, M.S.W. (Tr. at 341.)

13

interacting appropriately with the general public, and was in between the "limited but satisfactory" and "seriously limited, but not precluded" categories with respect to her ability to set realistic goals or make plans independently of others. (*Id.*)

Thayer also concluded that Plaintiff was "unable to meet competitive standards" as to traveling in unfamiliar places or using public transportation. (*Id.*) Thayer found either no restrictions or mild restrictions as to activities of daily living, moderate difficulties in maintaining concentration, persistence or pace, and marked difficulties in maintaining social functioning. (Tr. at 547.) He also found four or more episodes of decompensation within a twelve-month period, each of at least two weeks' duration because the "client reports ongoing, persistence episodic phases of depression and anxiety across entire past year." (*Id.*) Thayer found that Plaintiff had a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of her ability to do any basic work activity and an anxiety related disorder and complete inability to function independently outside the area of one's home. (*Id.*) Thayer also concluded that Plaintiff's impairments would cause her to be absent more than four days per month. (Tr. at 548.)

### 3.    Plaintiff's Report and Testimony

In her Daily Function Report, Plaintiff indicated that she is able to take care of her own personal care other than buttoning shirts, cook simple meals such as frozen dinners two or three times a week, move laundry in and out of the appliances, "mow [the] lawn about 1 hour every two weeks[,]" take the dog outside "5-6 times a day[,]" drive and ride in a car alone, shop in stores and by phone for groceries, clothes, or "anything [the] family needs" once or twice a week for thirty to forty minutes, watch television, listen to books on tape, sing in "praise bands" three times a week, socialize with family and friends every day, attend church three times a week for one and

a half hours each time, take her son to and from school five days a week, visit her father at his home once a week, and handle her personal finances. (Tr. at 188-92.)

At the administrative hearing, Plaintiff testified that even when she is not using her hands, they "still hurt and they are still tingling . . . just sitting here they are just numb and swollen . . . ." (Tr. at 47.) Plaintiff also stated that although she can lift a gallon of milk off the shelf and put it in a grocery cart, she cannot carry a gallon of milk. (Tr. at 47-48.) Plaintiff also testified that her back hurts if she walks approximately the length of a football field because of the "scoliosis [she had] as a child" and that walking also "bothers . . . the screws I have in my left foot." (Tr. at 48.) Plaintiff indicated that she can stand for "maybe ten or 15 minutes" at a time. (Tr. at 49.) Plaintiff stated that she does not cook or open jars, and that she does not wear clothing with buttons because they are too hard to maneuver. (*Id.*) Plaintiff further testified that she can sit for "a half-hour and 45 minutes" at a time and that she can drive for around "30 minutes without [her] . . . hands go[ing] numb holding the steering wheel . . . ." (Tr. at 51.) Plaintiff stated that she can use a computer for "about 20 or 25 minutes . . . and this is not a lot of typing . . . I mean, that's not constantly typing or clicking." (Tr. at 58-59.) Plaintiff also stated that she has migraines that can last "for days" and that when she has one, she stays at home in the "quiet." (Tr. at 56.)

### 4.   **Vocational testimony**

The ALJ asked the vocational expert ("VE") to assume a person with Plaintiff's background who is

> limited to lifting and carrying up to ten pounds occasionally and less than ten pounds
> frequently, could stand and/or walk about six hours a day, could sit about six hours
> daily, could push and pull without limits other than the ten and 20-pounds lifting and
> carrying limit. If this individual could only occasionally crawl, could frequently
> climb ramps or stairs, but never climb ladders, ropes, or scaffolds. Could frequently
> balance, stoop, kneel, crouch and crawl. And, if she could only occasionally work
> at or above the shoulder level and occasionally handle, finger, and feel. If the

individual were limited to simple, routine tasks where she would be able to respond
to supervisors and coworkers and the general public and adjust to changes.

(Tr. at 62.) The VE responded that such a person could not perform Plaintiff's past relevant work

but could perform the unskilled, sedentary jobs of call-out operator (1,200 of which are available

in the State of Michigan) and election clerk (1,100), as well as the unskilled light level jobs of

counter clerk (7,000) and bus monitor (3,700). (Tr. at 63.) The ALJ then asked the VE to assume

all the same considerations except to reduce the lifting to no more than ten pounds and the VE

indicated that the jobs described would not be affected. (Tr. at 63-64.) Next, the ALJ asked the VE

to assume a person with Plaintiff's background who

> would need to be able to sit for 15 minutes at a time for a total of four hours a day.
> Could stand about 30 minutes at a time. Could walk one or two blocks at a time and
> could total stand and walk about two hours. They would need to be able to shift
> positions at will, from sitting, standing, and walking and would need to include
> periods of walking every 15 minutes for [INAUDIBLE] for approximately
> [INAUDIBLE].

> The individual would need to take unscheduled breaks three times a day lasting ten
> or 15 minutes at a time. Could rarely lift even less than ten pounds. Could less than
> occasionally or rarely twist, stoop, crouch, or climb stairs. Could never climb
> ladders. Can use their hands for handling, grasping, turning and twisting objects one
> percent or less of the time during the day. Could also finger, doing fine manipulation
> lasting one percent or less at the time during the day. Could also reach in front of
> the body one percent or less of the time. And, could do no overhead reaching. This
> person would likely be off-task 100 percent of the time, incapable of even low-stress
> jobs.

(Tr. at 64-65.) The VE testified that there would not be any jobs that such a person could perform.

(Tr. at 65.) The ALJ then asked the VE to assume a person with Plaintiff's background who was

unable to meet competitive demands in many areas after which the VE indicated that such a person

would not be able to perform any jobs. (Tr. at 65-66.)

## F.    Analysis and Conclusions

## 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of light and sedentary work. (Tr. at 18-22.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

S.S.R. 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

**2.    Substantial Evidence**

17

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 9.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the "ALJ failed to properly evaluate the opinions of the treating medical sources in accordance with the regulations and controlling case law, and the result was an opinion unsupported by substantial evidence." (Doc. 9 at 15-20.) In addition, Plaintiff argues that the "ALJ erred in failing to consider evidence of Plaintiff's frequent migraine headaches." (Doc. 9 at 20.)

### a.    Treating Sources

Plaintiff argues that the ALJ improperly "rejected" the opinion of Plaintiff's treating neurologist, Dr. Clague, in favor of Dr. Bente, who was a non-examining physician. (Doc. 9 at 15-16.) In addition, Plaintiff contends that the ALJ improperly rejected Plaintiff's treating limited license psychologist, Ross Thayer, in favor of "a one-time examining psychologist, Dr. Gallagher, and a case analysis by a Dr. Biscardi[.]" (Doc. 9 at 18.)

### i.    Standards

"Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." S.S.R. 06-3p, 2006 WL 2329939, at *2 (2006).

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R.  § 404.1527(c)(3). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

Since the Commissioner is responsible for determining whether a claimant meets the statutory definition of disability, the ALJ "will not give any special significance to the source of an opinion[, including treating sources], on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section[,]" i.e., whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, residual functional capacity, and application of vocational factors. 20 C.F.R. § 404.1527(d)(3). A "[d]octor's notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' [Thus,] [a]n ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (citation omitted). "Otherwise, the hearing would be a useless exercise." *Id.*

"[A] treating physician's assessment may be unreliable because of the bias he or she may bring to the disability evaluation," i.e., he or she "'may want to do a favor for a friend and client,

19

and so the treating physician may too quickly find disability.'" *Id.* at 1073 (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)). "Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise." *Dixon*, 270 F.3d at 1177. "[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight . . . [but] 'is just one more piece of evidence for the administrative law judge to weigh . . . .'" *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)). Once the treating source is placed on the same level as other medical opinions, the treating source opinion should not be subjected to "greater scrutiny" than the non-treating sources, especially when there are more flagrant inconsistencies in the opinions of the non-treating sources. *Gayheart v. Comm'r of Soc. Sec.*, ___ F.3d ___, 2013 WL 896255, at *13 (6th Cir. 2013).

If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the treating source opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. These factors may be applied to all medical opinions, not just treating sources. S.S.R. 06-3p, 2006 WL 2329939, at *3 (2006). However, because of the special status of treating source opinions, where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error." *Cole v. Comm'r of Soc. Sec.*, 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

20

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "Acceptable medical sources" who can be considered treating sources include "licensed or certified psychologists." S.S.R. 06-03p, 2006 WL 2329939, at *1-2 (2006). After treating sources, a "nontreating source, who physically examines the patient 'but does not have, or did not have an ongoing treatment relationship with' the patient, falls next along the continuum." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). "'The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 F. App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." S.S.R. 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

ii.     **Physical Impairments**

Plaintiff contends that the ALJ improperly "rejected" the opinion of Plaintiff's treating neurologist, Dr. Clague, in favor of Dr. Bente, who was a non-examining physician. (Doc. 9 at 15-16.) I suggest that the ALJ properly considered and gave reasons for the weight given the medical source opinions and that his decision was supported by substantial evidence. (Tr. at 14-22.)

The ALJ thoroughly considered all of the medical opinions and evidence regarding physical impairments and decided

> [t]o not give significant weight to Dr. Clague's assessment because the particulars of his assessment are not well supported by objective or other evidence. Further, the claimant has testified that there is no limitation on her ability to sit when she is not using her hands. I find the residual capacity by Dr. Bente to be more consistent with the evidence as a whole and I accord more significant weight to the assessment of Dr. Bente than to the residual functional capacity assessments of Dr. Clague.

(Tr. at 19-20.)

After noting that Plaintiff had applied for social security disability benefits, Dr. Clague stated, "I never foresee her being able to return to any form of gainful productive employment throughout the remainder of her lifetime." (Tr. at 469.) However, on that same date, Dr. Clague found that Plaintiff's "gait was normal[,] . . . [t]andem walking was good and her balance was good[,]" lumbosacral spine was normal, there was some "limitation of motion" in the cervical spine, and Plaintiff's "hands revealed hyperextension of the distal phalanx of the fingers"; Clague stated that these "findings suggest an anterior interosseous nerve syndrome." (Tr. at 468.)

First, Dr. Clague's conclusion that Plaintiff will be forever unable to work is an opinion that is not entitled to any particular weight since "[i]t is well settled that the ultimate issue of disability is reserved to the Commissioner." *Kidd v. Comm'r*, 283 F. App'x 336, 341 (6th Cir. 2008); *Turner*, 381 F. App'x at 492-93; 20 C.F.R. § 404.1527(d)(3). In addition, the ultimate determination of residual functional capacity is also reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(3). Dr.

22

Clague may have been motivated in the same manner recognized by the courts as stemming from the treating physician's desire to help their patients obtain benefits. *See Masters, supra; Dixon, supra.* Or, perhaps, Dr. Clague was referring only to Plaintiff's ability to return to her prior job as an assembler, which she would not be able to do since that work would aggravate her overuse syndrome. Whatever the motivation, Dr. Clague's medical findings do not support his conclusions regarding Plaintiff's functional capacity.

I further suggest that the record is replete with "well-supported contradicting evidence" contrary to Dr. Clague's opinion such that his opinion is "'just one more piece of evidence for the administrative law judge to weigh . . . .'" *Bauer*, 532 F.3d at 608 (quoting *Hofslien*, 439 F.3d at 377).[5] Dr. Markley indicated that Plaintiff could perform sedentary level light use jobs on a permanent basis. (Tr. at 256, 261.) In addition, Dr. Hing noted that he "referred her to Dr. Chodoroff [but that] [h]is study of 11/30/06 did not show any objective evidence for compression in . . . the bilateral median nerve at the wrist and the cubital tunnel at the wrist and elbow areas." (Tr. at 293.) Dr. Chodoroff confirmed that he "saw [Plaintiff] back in November of 2006 for an electrodiagnostic study, at which time the findings were "normal." (Tr. at 300.) An MRI of the cervical spine taken on March 7, 2007, was also "[n]ormal." (Tr. at 396, 668.) In addition, Dr. Hing noted that Plaintiff could perform work with restrictions to accommodate her impairments, i.e., avoiding vibrations, no repetitive grasping or power pinching, and minimal lifting. (Tr. at 264, 265, 297.)

I suggest that the ALJ correctly noted that Dr. Clague's opinion that Plaintiff could rarely lift less than ten pounds or perform any twisting, stooping, etc., and could only use her hands, fingers, or arms  "1% or less" of the eight-hour workday is completely unsupported by Dr.

_____

[5]I note that the ALJ did not subject Dr. Clague's opinion to greater scrutiny than any other medical opinion and, thus, did not commit the error described in *Gayheart, supra*.

Clague's own findings and the other medical evidence of record. (Tr. at 552-53.) In addition, Dr. Clague's findings that Plaintiff would be "off-task" 100% of the time and that she was incapable of even low stress work (Tr. at 554) is not only not completely inconsistent with the evidence of record but is outside of Dr. Clague's field of expertise and, thus, properly discounted by the ALJ. *See Johnson, supra*. I therefore suggest that the ALJ's decision not to give significant weight to Dr. Clague's opinion was supported by substantial evidence.

### iii.    Mental Impairments

Plaintiff argues that the ALJ improperly rejected Plaintiff's treating limited license psychologist, Ross Thayer, in favor of "a one-time examining psychologist, Dr. Gallagher . . . ." (Doc. 9 at 18.) The ALJ thoroughly considered the opinions of all the medical sources regarding mental impairments. (Tr. at 22.) I further suggest that the record contains "well-supported contradicting evidence" contrary to Thayer's opinion and that Thayer's opinion is internally inconsistent such that his opinion is "'just one more piece of evidence for the administrative law judge to weigh . . . .'" *Bauer*, 532 F.3d at 608 (quoting *Hofslien*, 439 F.3d at 377).[6]

As noted by the ALJ, "[c]ontact notes document ongoing stressful problems-in-living such as 'anxiety and depression related to disability from work, medical complaints, and financial pressure' but the contact notes do not corroborate the marked difficulties in maintaining social functioning, or the four or more incidents of decompensation within a twelve-month period, indicated by Mr. Thayer." (Tr. at 22 (citations omitted).) I suggest that this observation is an accurate description of the lack of evidence to support the findings by Thayer. In addition, although Thayer found either no restrictions or mild restrictions as to activities of daily living, he found that Plaintiff had experienced four or more episodes of decompensation within a twelve-

---

[6]I note that the ALJ did not subject Thayer's opinion to greater scrutiny than any other medical opinion and, thus, did not commit the error described in *Gayheart, supra*.

month period, each of at least two weeks duration because the "client reports ongoing, persistence episodic phases of depression and anxiety across entire past year." (Tr. at 547.) I suggest that Thayer's findings are internally inconsistent because if one experienced these episodes of decompensation, it would more than mildly restrict their daily activities.

Moreover, there is no evidence to support Thayer's conclusion that Plaintiff was "seriously limited" from interacting appropriately with the general public. (Tr. at 546.) Instead, Plaintiff indicates that she is social with family and friends every day, attends church three times a week and participates in a praise band three times a week. (Tr. at 188-92.) In addition, as noted by Dr. Gallagher,

> [r]ecords show that the claimant was on Zoloft from at least 9/05 by Dr. Smith but Dr. S does not give any dx except to say that she is stressed. There is no other mention of psych concerns in his records from AOD to present. The MSW puts the depression as occurring during the past year. There is no evidence that the depression was any worse prior to CE and eval by Herrick. It is only considered severe here as the combination of depression and pain appears to affect her concentration and daily functioning to some extent. She is still able to sustain simple routine tasks.

(Tr. at 439.) After the RFC, Plaintiff participated in therapy in addition to taking prescription medication. However, Plaintiff was never hospitalized for depression and instead received only modest treatment that is inconsistent with a finding of disability. *See Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007).

I therefore suggest that the ALJ's decision to give less than controlling weight to Thayer's opinion was supported by substantial evidence.

### b.    Migraine Headaches

Plaintiff argues that the "ALJ erred in failing to consider evidence of Plaintiff's frequent migraine headaches" because she "did not discuss migraines in either the 'severe impairment' or RFC portions of her decision." (Doc. 9 at 20.)

25

In the Sixth Circuit, "the severity determination is 'a *de minimis* hurdle in the disability determination process.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Higgs*, 880 F.2d at 862. The test is used to "screen out totally groundless claims." *Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).

Plaintiff's argument that the ALJ erred by not adding migraine headaches to the list of severe impairments fails because once step two is "cleared" by a finding that some severe impairment exists, then the ALJ must consider a plaintiff's "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony*, 266 F. App'x at 457. "The fact that some of [Plaintiff's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Id.* Consequently, I suggest that any alleged omission from the list of severe impairments does not undermine the ALJ's decision. As to the RFC analysis, the ALJ expressly stated that she considered "all of the claimant's impairments, including impairments that are not severe." (Tr. at 13.) I therefore suggest that the ALJ committed no error. *See Kornecky,* 167 F. App'x at 508 ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.").

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ Charles E Binder

CHARLES E. BINDER
Dated: March 19, 2013                    United States Magistrate Judge

### **CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  March 19, 2013                    By    s/Patricia T. Morris
                                              Law Clerk to Magistrate Judge Binder